# Exhibit A



Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809

415 391 5400
keker.com

**Elliot R. Peters**
(415) 676-2273
epeters@keker.com

April 9, 2021

**VIA ELECTRONIC MAIL**

Holly Newman Kroft
Managing Director
Neuberger Berman | New York
1290 6th Avenue
New York, NY 10104
holly.kroft@nb.com

Re:   GVA Auto LLC

Dear Ms. Kroft:

We represent GVA Capital Ltd., the general partner and Manager of GVA Auto LLC. We write in response to your (and your colleague Adon Vanwoerden's) recent requests for additional information about "the ownership structure of GVA Auto in Luminar."

In short, and as we explain in more detail below:

1. GVA Auto LLC ("GVA Auto") owns 18,000,000 preferred shares in Luminar Technologies, Inc. ("Luminar"). Although Luminar is now publicly traded, the shares are subject to a lock-up provision and cannot be sold until June 2021.

2. As set out in the GVA Auto Operating Agreement ("OA"), GVA Capital Ltd. ("GVA Capital") is GVA Auto's Manager. In that capacity, GVA Capital has the power and authority to "sell or otherwise dispose of all or substantially all of" GVA Auto's assets, which it will be free to do at its discretion once the lock-up period expires.

3. When GVA Capital chooses to sell GVA Auto's interest in Luminar, and consistent with the parties' agreements, GVA Capital will distribute any proceeds as follows:

   - First, GVA Capital will distribute $18.5 million to Prosperity Investments LP's ("Prosperity's") successor entity, Definition Services Inc. ("Definition"). This distribution will be made in full, irrespective of the proceeds realized by the sale. In

Holly Newman Kroft  
April 9, 2021  
Page 2

VIA ELECTRONIC MAIL

- other words, if the sale does not net $18.5 million, GVA Capital will be required to (and will) make up any shortfall.

- Then, if any funds remain after the $18.5 million distribution to Definition, GVA Capital will distribute those proceeds (the "Remaining Proceeds") as follows: (1) to GVA Capital, its Carried Interest (*i.e.*, 10% of any Remaining Proceeds), per the OA; and (2) to GVA Capital, 90% of the Remaining Proceeds, if any such proceeds exist.

This is the distribution contemplated and established by the parties' agreements, including the "Profit and Loss Agreement" ("PLA") that was entered into by and between GVA Capital and Prosperity. In the PLA, and as GVA Capital has explained to you before, the parties agreed that Prosperity—and thus, by extension, Definition as Prosperity's successor—would be made whole on its original $20 million investment in GVA Auto, no matter how well (or poorly) the underlying assets perform. If the investment ultimately loses money, GVA Capital has agreed to and will refund Prosperity/Definition for any shortfall; on the other hand, if those investments result in a positive return, Prosperity/Definition has agreed that GVA Capital is entitled to keep any profit.

* * *

By way of background, and as you may already know, the business relationship between GVA Capital and Prosperity/Definition grew out of a personal relationship between Magomed Musaev and Suleiman Kerimov. These two men, who both hail from Dagestan, have known each other for more than twenty years. Mr. Musaev was well known in the Moscow business community, where he worked for the mayor's office and served as a Minister of Innovation in Dagestan. In addition, he was—and remains—well known for his work in venture capital and on technology startups, traveling frequently to Silicon Valley to manage existing investments and explore new opportunities.

In that vein, Mr. Musaev discussed certain investment opportunities with Mr. Kerimov in 2016, which led to their decision to explore joint business opportunities. To facilitate the investments in Silicon Valley by Mr. Kerimov and his family, a Partnership called Prosperity Investments LP was formed. Mr. Kerimov's children were ultimately the sole owners of Prosperity. Mr. Kerimov's nephew, Nariman Gadzhiev, was appointed as its Director and tasked with overseeing the investments.

Prosperity invested in three companies that would be (and have been) managed by Mr. Musaev's company, GVA Capital: GVA Auto LLC, the entity you have enquired about; GVA Vestor.In Partners Fund LP; and Startup Temple Fund Ltd.[1] Of those, GVA Auto was established to invest in a company called "Luminar"—a promising new startup, identified by Mr. Musaev, whose focus was on developing lidar technology for autonomous transportation. Mr. Musaev and

---

[1] Each of these three entities is governed by the same Profit and Loss Agreement, although because your written request focused on GVA Auto specifically, our response does too.

Holly Newman Kroft  
April 9, 2021  
Page 3

**VIA ELECTRONIC MAIL**

Mr. Gadzhiev agreed that Prosperity would invest $20 million in GVA Auto, which GVA Auto then invested in Luminar.

However, not long after Prosperity invested in GVA Auto, Prosperity's principals cooled on the idea. Undoubtedly, Luminar was a high-risk prospect: its founder, Austin Russell, was a teenage college dropout with little more than a big idea. Mr. Musaev, who had identified and advocated for the company, was enamored with the technology and believed Mr. Russell would succeed. But Mr. Gadzhiev and Mr. Kerimov were less convinced, and they repeatedly asked Mr. Musaev and GVA Capital to extricate Prosperity from the deal by selling GVA Auto's interest. To keep Prosperity happy, GVA Capital tried but had limited success in securing a buyer for Prosperity's interest in GVA Auto.[2] By late 2016, Mr. Kerimov and Mr. Gadzhiev had become increasingly vocal in their concerns and criticism. Indeed, Prosperity/Definition ultimately defaulted on its financial commitments to *other* GVA Capital entities while it continued to demand an exit from GVA Auto. In the end, because of the principals' longstanding personal relationship, and in the hopes of maintaining an ongoing business relationship with Mr. Kerimov, Mr. Musaev made an offer that he thought would allay Mr. Kerimov's concerns—the PLA. Mr. Musaev's proposal was simple: GVA Capital would take on Prosperity/Definition's risk. If the investment in Luminar failed, GVA Capital would refund Prosperity its entire $20 million investment (or, later, the remaining $18.5 million of Prosperity's investment); in exchange, if Mr. Musaev was right and Luminar succeeded, GVA Capital would be entitled to keep whatever proceeds it netted from the sale in excess of Prosperity/Definition's initial $20 million investment. Mr. Kerimov—as Prosperity's owner and on its behalf—agreed to the proposal; it was ratified by Mr. Gadzhiev, Prosperity's Director.

The details of this arrangement were confirmed on several other occasions during in person meetings between Mr. Kerimov, Mr. Gadzhiev, Mr. Musaev, and other representatives of GVA Capital.

Mr. Gadzhiev, who was Prosperity's Director when the PLA was entered into, has also confirmed that he understood and ratified the agreement, which he has described thus in recent written correspondence:

> [W]e did have a verbal agreement where GVA has undertaken an obligation to compensate Prosperity for any possible losses of invested funds related to the three mentioned entities. The reverse side of that agreement was that should the disposition of assets takes place, any amounts that are generated in excess of the invested amount can be retained by GVA. As far as I know, no amendments or changes were made to this agreement after it was made.

---

[2] GVA Capital found a buyer willing to take on 5% of GVA Auto's interest in Luminar, which it sold for $1.5 million in July 2017. Consistent with the parties' agreements, GVA Capital returned those proceeds to Prosperity, reducing GVA's remaining commitment to $18.5 million.

Holly Newman Kroft  
April 9, 2021  
Page 4

VIA ELECTRONIC MAIL

GVA Capital intends to abide by the terms of the PLA. When it sells GVA Auto's interest in Luminar, it will distribute the proceeds accordingly: first, it will ensure that Definition is made whole for Prosperity's investment; then it will ensure that the Manager is paid for its services, consistent with the requirements of the OA; and then, if any proceeds remain, GVA Capital will retain them.

If you have questions or wish to discuss this further, please let us know.

Very truly yours,

KEKER, VAN NEST & PETERS LLP

Elliot R. Peters

ERP:jab

1647709